UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

$94,995.00 IN UNITED
STATES CURRENCY

        Defendant.

CASE NO. 3:21-cv-329-BJD-MCR

_____/

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

In accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, Plaintiff United States of America brings this complaint and alleges upon information and belief as follows:

### I.    NATURE OF THE ACTION

1.    This is a civil action *in rem* to forfeit to the United States $94,995.00 in United States Currency (defendant funds).

2.    The defendant funds were seized on July 30, 2020 in Jacksonville, Florida, and are in the government's custody, having been deposited into the United States Marshal Service's Seized Asset Deposit Fund Account.

### II.    JURISDICTION AND VENUE

3.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345, which provides the Court with jurisdiction over all civil actions

commenced by the United States, and pursuant to 28 U.S.C. § 1355, which provides

the Court with jurisdiction over actions to recover or enforce forfeitures.

4.      This Court has *in rem* jurisdiction over the defendant funds because

pertinent acts giving rise to the forfeiture occurred in the Middle District of Florida.

28 U.S.C. § 1355(b)(1)(A).

5.      Venue properly lies in the Middle District of Florida pursuant to 28

U.S.C. § 1395(a) because the defendant funds were seized within the Middle District

of Florida, Jacksonville Division.

6.      Because the defendant funds are in the government's possession,

custody, and control, the United States requests that this Court issue an arrest

warrant *in rem*, upon the filing of the complaint, pursuant to Supplemental Rule

G(3)(b)(1). Rule G(3)(b)(1) requires the Clerk to issue a warrant of arrest *in rem* for

defendant property if such property is in the government's possession, custody, or

control.

7.      After the Court issues the warrant *in rem*, the United States will execute

the warrant pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

### III.   **FORFEITURE AUTHORITY**

8.      The defendant funds are subject to forfeiture to the United States

pursuant to 21 U.S.C. § 881(a)(6), because they constitute (1) money furnished or

intended to be furnished by any person in exchange for a controlled substance in

violation of the Controlled Substance Act; (2) proceeds traceable to such an

2

exchange; or (3) money used or intended to be used to facilitate any violation of the Controlled Substance Act.

9.     The following facts support a reasonable belief that the government will be able to show by a preponderance of the evidence that the defendant funds are subject to forfeiture, pursuant to 21 U.S.C. § 881(a)(6).

## IV.   FACTS

10.     The facts and circumstances supporting the forfeiture of the defendant funds have been provided by Drug Enforcement Administration Special Agent Robney R. Bradshaw who states the following:

11.     On July 30, 2020, Anthony Jose **Choto**, Darius Kha Rande **Stevens**, Deidrick **Gerald**, and Andrew Jamar **Clark** were ticketed to fly one-way from Jacksonville, Florida to Los Angeles, California on American Airlines, flight number 964, scheduled to depart at 3:40 pm. **Gerald** purchased tickets earlier that day for himself, **Stevens,** and **Choto. Gerald** purchase the three one-way tickets at 2:59 am. **Clark** purchased his own one-way ticket at 8:28 am.

12.     California is a known source state for controlled substances. It is a common practice for drug traffickers and money couriers to transport currency to California, purchase controlled substances once there, ship the controlled substances back to Florida (often via the U.S. mail or other commercial carriers), and then sell the controlled substances in Florida, or elsewhere. Drug traffickers often purchase one-way tickets since the drug trade is unpredictable. The illegal

3

drug trade is a cash business. Drug traffickers generally do not accept checks, credit cards, debit cards, wire transfers, or any other method of payment that will leave a "paper trail."

13.    In 2016, voters in California approved a ballot measure called Prop 64. It made marijuana "legal" (at the state level) for anyone over the age of 21. More marijuana is grown in California than is sold within the state, and most of the surplus is shipped east to states where marijuana is still illegal and can be sold at a higher price.

14.    On the afternoon of July 30, 2020, law enforcement agents observed **Clark** and **Stevens** enter the terminal at the Jacksonville International Airport.

15.    The agents approached the two men separately (one agent addressing **Clark** while the other agent sought to speak with **Stevens**). The agents identified themselves and asked if the men were willing to speak. The agents explained that the men were not under arrest, were free to leave, and free to decline to be interviewed.

16.    While agents were speaking with **Clark** and **Stevens,** an unidentified individual arrived at the check-in area carrying a large suitcase. By the time the agents finished speaking with **Clark** and **Stevens,** the individual had left the area—abandoning the large suitcase.

## Interview of Clark

17.     **Clark** told the agent who was interviewing him that he was going to Los Angeles to celebrate a friend's birthday.

18.     When agents asked **Clark** if he had any narcotics, contraband, or large sums of currency on his person or in his luggage, **Clark** became visibly nervous and began shaking and sweating. **Clark** said that he did not have any narcotics or contraband and hesitated before claiming he had $1,500.00. **Clark** then hesitated a bit more before claiming he had $3,000.00. After hesitating a third time, **Clark** said he had "$4,000.00, no $5,000.00."

19.     When asked if the agents could see the money, **Clark** took out a wallet with a large amount of currency inside. When told by the agent that there appeared to be more than $5,000.00, **Clark** said he didn't know how much he had.

20.     The agent then asked **Clark** for permission to search **Clark's** luggage. Clark agreed and the agent discovered what appeared to be more than $10,000 in Clark's suitcase.  The money was hidden within the suitcase in clothing, shoes, and inside the zippered internal liner of the suitcase. The agent found more bundles of currency in **Clark's** carry-on bag and on **Clark's** person. Many of the bundles were bundled in rubber bands. The way the currency was packed and concealed was consistent with how drug traffickers and money couriers transport currency.

21.    **Clark** said he did not know the exact amount of currency he was carrying. When asked where the money came from, **Clark** advised that he withdrew it from a bank account.

22.    The total amount of currency seized from **Clark** was $14,965.00.

### Interview of Stevens

23.    **Stevens** told the agent who was interviewing him that **Stevens** used to work TSA.

24.    **Stevens** claimed he was going to California to celebrate his birthday and visit his cousin who **Stevens** claimed was a famous rapper.

25.    When asked whether he had any narcotics, contraband, or large sums of currency on his person or in his luggage, **Stevens** said, "No," while touching his pants pocket. **Stevens** later claimed a "friend" gave him some money to spend in California and said that money was in his wallet.

26.    When asked how much money was in his wallet, **Stevens** said, "about $2,000.00." He then opened his wallet and displayed what appeared to be well over $2,000.00.

27.    When asked again how much money he had in the wallet, **Stevens** said "$5,000.00" but stated so in a manner as if he was guessing.

28.    The agent also noticed a bulge in **Steven's** front pant pocket and asked whether that bulge was more cash. **Stevens** replied that it was and reached in and removed a large bundle of currency.

29.    When asked if he was transporting any currency in his suitcase,
**Stevens** claimed he was not.

30.    **Stevens** consented to a search of his suitcase and the agent found a
large amount of currency packaged in multiple bundles located and hidden
within the suitcase in clothing, shoes, and inside the zippered internal liner of the
suitcase. The way the currency was packed and concealed was consistent with
how drug traffickers and money couriers transport currency. See pictures below.

 

 

31.     **Stevens** claimed the money was his but said he did not know how much he was travelling with. When asked where the money came from, **Stevens** claimed that he was a welder and had worked "under the table." **Stevens** said that he did not have any records or proof of that "under the table" income.

32.     The amount seized from **Stevens** was $41,830.00.

### Interview of Choto

33.     After the agents interviewed **Clark** and **Stevens**, **Choto** returned to the check-in area. Like **Clark** and **Stevens**, **Choto** was ticketed to fly one-way from Jacksonville to Los Angeles. **Gerald** purchased **Choto's** ticket, just as he had purchase one for himself and **Stevens** (**Clark** purchased his own ticket).

34.     **Choto** approached the agents and said that the large suitcase belonged to him. **Choto** also claimed that the currency taken from **Clark** and

8

**Stevens** belonged to him. **Choto** claimed not know why **Clark** and **Stevens** lied to the agents about his money being in their possession.

35.     After a brief conversation, Choto left the area to get his identification (to prove the large suitcase was his). He returned shortly thereafter with his identification. Once it was confirmed that the large suitcase was his, the agents questioned him about the suitcase.

36.     When asked for permission to search the large suitcase, **Choto** spontaneously uttered, "There's like $30,000.00 in there, but that's it." The agent again asked for permission to search the large suitcase and **Choto** responded, "Yes, I told you what you're going to find."

37.     In the suitcase, agents discovered $38,200.00. Some of the money was hidden in the suitcase amongst **Choto's** clothing and shoes and some of it was behind the internal liner of the suitcase. Many of the bundles were bundled in rubber-bands. The way the currency was packed and concealed was consistent with how drug traffickers and money couriers transport currency. The currency was packed and concealed like the currency found in the luggage of **Clark** and **Stevens**.  See pictures below.

 

38.     The agents asked **Choto** whether he had packed the luggage belonging to Clark and Stevens. **Choto** responded, "I told them how to do it because it was their first time." **Choto** also mentioned that "This happened to [him] in L.A."

### Additional Facts

39.     Further investigation revealed that **Choto** has a marijuana license (#C127870) that was issued on April 22, 2017.

40.     In 2016, **Gerald**, the individual who purchased the three tickets involved in this seizure, was convicted of the felony offense of Purchase, Possession, Manufacture, Distribution or Sale of Marijuana.

41.     In 2018, **Gerald** was also convicted of the felony offense of Purchase, Possession, Manufacture, Distribution or Sale of Marijuana.

42.     On May 17, 2017, **Choto** was stopped at Los Angeles International Airport after arriving on a flight from Tampa, Florida. On that occasion, **Choto** carried $18,000.00 and was traveling with three other individuals. Together, the four men had $61,108.00.  One of Choto's travelling companions purchased tickets for three of the four travelers the day before the flight.

## V.     CONCLUSION

43.     As required by Rule G(2)(f), the facts set forth herein support a reasonable belief that the government will be able to meet its burden of proof at trial. Specifically, they support a reasonable belief that the government will be able to show by a preponderance of the evidence that the defendant funds are proceeds traceable to the exchange of controlled substance or were intended to be exchanged for a controlled substance, in violation of 21 U.S.C. § 841 and 846 and, therefore, are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

WHEREFORE, the United States of America requests that process in accordance with the provisions of Rule G, Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, be issued against the defendant funds to enforce the forfeiture and that any person or persons having an interest therein be cited and directed to appear and show cause why it should not be decreed; and that the defendant funds be forfeited to the United States; and that thereafter it be disposed of according to law; and for such other and further relief as this case may require.

Dated:  March 24th, 2021.

Respectfully submitted,


KARIN HOPPMANN
Acting United States
Attorney


By:

MAI TRAN
Assistant United States Attorney
Florida Bar No. 100982
300 N. Hogan Street, Ste 700
Jacksonville, Florida 32202
Telephone: (904) 301-6300
Facsimile: (904) 301-6310
E-mail: mai.tran2@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Robney R. Bradshaw, declare under the penalty of perjury, that:

I am a Special Agent with the Drug Enforcement Administration. I have read the foregoing Verified Complaint for Forfeiture *in Rem* and have personal knowledge that the matters alleged as fact in the Complaint are true.

I have acquired my knowledge in this matter through my personal experience, observation, and investigation, and training, and from witnesses, records, and other law enforcement officers.

Executed this 23 day of March, 2021.

R.R. Bradshaw

ROBNEY R. BRADSHAW
Special Agent
Drug Enforcement Administration